44 F.3d 141
 148 L.R.R.M. (BNA) 2226, 23 Media L. Rep. 1205
 UNITED STATES of America, Plaintiff,
v.
Anthony R. AMODEO, Sr., "Chick," President and Business
Manager of Local 100 of the Hotel Employees & Restaurant
Employees International Union, AFL-CIO; Anthony R. Amodeo,
Jr., Vice-President of Local 100 of the Hotel Employees &
Restaurant Employees International Union, AFL-CIO; Local
100 of the Hotel Employees & Restaurant Employees
International Union, AFL-CIO, and Hotel Employees &
Restaurant Employees International Union, AFL-CIO, Defendants.
NEW YORK NEWSDAY, INC., Non-Party-Applicant-Appellee,
v.
MEYER, SUOZZI, ENGLISH & KLEIN, P.C., Affected-Non-Party-Appellant.
 Nos. 865, 967, Dockets 94-6194, 94-6212.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 23, 1994.
Decided Jan. 4, 1995.
 
 Stephen Gillers, New York City, for affected-non-party-appellant.
 Christopher J. Nolan, Melville, NY, for non-party-applicant-appellee.
 Anthony M. Supino, Arkin Schaffer & Supino, New York City, submitted a brief for amicus curiae Mary Shannon Little.
 Before: VAN GRAAFEILAND, MINER and McLAUGHLIN, Circuit Judges.
 MINER, Circuit Judge:
 
 
 1
 Affected-non-party-appellant-cross-appellee Meyer, Suozzi, English & Klein, P.C. ("Meyer, Suozzi"), a law firm, appeals from an order entered in the United States District Court for the Southern District of New York (Patterson, J.) releasing a modified version of a sealed investigative report filed with the court. The report was prepared and filed by Mary Shannon Little who, under the provisions of a Consent Decree, was appointed Court Officer to investigate union-related corruption and take appropriate remedial action. After non-party-applicant New York Newsday, Inc. ("Newsday"), a newspaper publisher, moved to unseal the original report, the Court Officer submitted an edited and redacted copy to the court in camera. The district court ordered the release of the report with the modifications made by the Court Officer. In its cross-appeal, Newsday challenges the district court's reliance on the Court Officer, arguing that the task of editing and redacting must be performed only by the court itself.
 
 
 2
 In ordering the unsealing and the release of the investigative report, the district court determined that the report was a court record to which the common law right of access applies. The court found that Meyer, Suozzi had not carried its burden of showing that it is in the public interest that the modified report remain under seal. The district court accepted the Court Officer's representation that release of the edited and redacted version would not jeopardize law enforcement interests, including the identity of cooperating witnesses. On appeal, Meyer, Suozzi contends that law enforcement and privacy interests preclude the release of the Court Officer's report, that the mere filing of the report did not extinguish Meyer, Suozzi's privacy interests and that the district court, although recognizing Meyer, Suozzi's privacy right, improperly concluded that this right was surrendered by virtue of its prior conduct.
 
 
 3
 We affirm in part, reverse in part and remand with instructions.BACKGROUND
 
 
 4
 On October 22, 1992, the United States filed its complaint in a RICO action against Local 100 of the Hotel Employees & Restaurant Employees International Union ("Local 100") and certain of its officers. According to the complaint, organized crime figures and various corrupt individuals had infiltrated and gained control over Local 100, exploited their control for personal gain and regularly yielded the rights of the union members in return for illicit payoffs. A Consent Decree settling the action was filed on October 23, 1992. The Consent Decree appointed Henry Tamarin as Trustee "[t]o administer, supervise and conduct the daily affairs of Local 100" and conferred upon him numerous other powers in regard to the appointment and election of officers and employees of Local 100, the marshaling of the union's assets, the negotiation of collective bargaining agreements, the supervision of the union's finances and other matters.
 
 
 5
 The Consent Decree also appointed Mary Shannon Little, whose Report is the subject of the action giving rise to this appeal, as Court Officer "to investigate corruption and oversee the actions of the Trustee of Local 100." Conferred upon Ms. Little were powers to investigate alleged corruption within the union, to investigate alleged misconduct by employers under collective bargaining agreements with Local 100, to supervise and assist the Trustee in recovering assets of Local 100, to review the books and records of the union and to refer possible criminal law violations to the appropriate local or federal law enforcement authorities. The Consent Decree provides Ms. Little with the authority to subpoena witnesses and documents and to take testimony under oath in carrying out her duties. It also provides her with "all of the powers, privileges and immunities of a person appointed pursuant to Rule 66, Fed.R.Civ.Pro. and which are customary for court appointed offices [sic] performing similar assignments." (Rule 66 is entitled "Receivers Appointed by Federal Courts.").
 
 
 6
 According to the Consent Decree, the Court Officer may "apply to the Court for such assistance as may be necessary and appropriate" to execute her powers. Her term of office is eighteen months, unless extended, and she may be removed for cause. If any party to the Consent Decree applies for enforcement of, or relief from, any of the provisions of the Decree, the court may grant equitable and just relief, "consider[ing] the record of all proceedings ... to the date of the application." In the discharge of her duties, the Court Officer already has subpoenaed and reviewed hundreds of documents and interviewed hundreds of witnesses. She has received information from confidential informants and has shared information with the office of the United States Attorney for the Southern District of New York, the office of the New York County District Attorney and various federal agencies. She advises that she has uncovered violations of criminal law which have been referred to the Criminal Division of the United States Attorney's office.
 
 
 7
 Although she is not required to do so, the Court Officer "deem[s] it prudent to keep the Court apprised of [her] investigation." Accordingly, it has been her custom to file reports from time to time with the Clerk of the district court to inform the court of the status of her activities. On occasion, Ms. Little has felt the need for confidentiality in reporting on her activities. She has included the information she deems confidential in addenda, designated Exhibit A, to the publicly filed reports. The public reports refer to the confidential reports, which are delivered directly to chambers with a request that they be placed under seal. These addenda also are made available to an Assistant United States Attorney and to federal law enforcement agents involved in the ongoing investigation conducted by the Court Officer. Ms. Little has been afforded access to certain grand jury materials and, presumably, some of those materials have found their way into the confidential reports.
 
 
 8
 Report III deals with Ms. Little's inquiry into various providers of services to Local 100. This report, consisting of seven pages, is dated July 30, 1993 and was filed publicly on August 2, 1993. Exhibit A to Report III is a fifty-seven page document. According to Ms. Little, it contains names of individuals and organizations she has contacted, the substance of her conversations with various targets, witnesses, and informants, documentary proof, a description of certain matters referred to law enforcement authorities and her conclusions. Because Meyer, Suozzi provided legal services to Local 100 during the period 1983-1991, and because Harold Ickes was the principal attorney in the firm handling the union's business, Ms. Little decided that "it was appropriate to inquire into the legitimacy and propriety of the services rendered by Mr. Ickes and his firm to Local 100."
 
 
 9
 After concluding this phase of her investigation, Ms. Little found that "neither [Meyer, Suozzi] nor Mr. Ickes committed any illegal acts or misconduct that would require [her] to take further action under the Consent Decree." This conclusion apparently was included in Exhibit A to Report III. Ms. Little reiterated this conclusion in a telephone conversation with William Cunningham, a Meyer, Suozzi partner, in November of 1993. Mr. Cunningham immediately thereafter released to the press a memorandum concerning the Court Officer's statement. Mr. Ickes, whose nomination to an important position in the administration of President Clinton had been the subject of widespread speculation and discussion, was named Deputy Chief of Staff to the President shortly after the circulation of Mr. Cunningham's memorandum.
 
 
 10
 Perceiving the information to be a matter of public interest, involving as it does the activities of a confidante of the President of the United States, a Newsday reporter wrote to Judge Patterson in March of 1994 to request access to the portions of the sealed report that pertain to Mr. Ickes' representation of Local 100. Judge Patterson replied that a motion demonstrating legally sufficient grounds for disclosure would be required. Thereafter, Newsday moved as Intervenor to unseal Exhibit A to Report III. In responding to the motion, the Court Officer averred that she never intended that the public have access to the confidential status reports and that, had she known that the reports would be accessible to the public, she would not have filed them at all.
 
 
 11
 With respect to the portion of Exhibit A pertaining to Mr. Ickes, Ms. Little notes that it "reflect[s] the identities of cooperating witnesses and other persons involved in [her] investigation, as well as confidential information provided to [her] by the Federal Bureau of Investigation." She asserts that she prepared Exhibit A for the "personal review" of the court and argued in the district court that the sealing should be maintained or, in the alternative, that the court release an edited and redacted version that she had submitted to the court in camera. Meyer, Suozzi urged the district court to retain Exhibit A under seal to protect its right to privacy.
 
 
 12
 In his Opinion and Order dated July 22, 1994, Judge Patterson determined that Exhibit A and Report III of the Court Officer, having been filed in a judicial proceeding, "are judicial documents to which the common law right of access may attach." He further determined that Meyer, Suozzi had not carried its burden of demonstrating that the public interest requires that Exhibit A, as redacted and edited by the Court Officer to protect the confidentiality of the information provided by certain individuals and organizations, remain under seal. Judge Patterson noted that the investigation which was the subject of Exhibit A had been concluded and that there was no claim of a need to protect any ongoing inquiry. He also noted that Meyer, Suozzi was the source of public statements about the Court Officer's conclusion in the first place and therefore concluded that the firm's privacy claim should be "discounted" for that reason. Finally, Judge Patterson observed that the public statements "suggest[ed] that a proposed appointment by the Executive was approved by the Court or screened under Court auspices." This observation was followed by the following admonition: "[T]his court has not and will not act as a screening or approving authority for appointments for the other branches of government." The Order directing the release of edited and redacted Exhibit A has been stayed pending the resolution of this appeal.
 
 
 13
 On appeal, Meyer, Suozzi argues that law enforcement and privacy interests preclude public release of an investigative report prepared by a person with broad criminal and civil law enforcement authority; that Meyer, Suozzi's privacy interests were not extinguished because the Court Officer filed her investigative report under seal solely to recount her progress; and that the district court, although recognizing Meyer, Suozzi's right of privacy in the report, improperly "discounted" the right. Meyer, Suozzi also contends that Exhibit A does not qualify as a judicial record and that filing alone cannot qualify it as such.
 
 DISCUSSION
 I.
 
 14
 The common law right of public access to judicial documents is said to predate the Constitution. See Leucadia, Inc. v. Applied Extrusion Technologies, Inc., 998 F.2d 157, 161 (3rd Cir.1993). Acknowledging the vitality of this long-established right, the Supreme Court has stated:
 
 
 15
 It is clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents. In contrast to the English practice, ... American decisions generally do not condition enforcement of this right on a proprietary interest in the document or upon a need for it as evidence in a lawsuit. The interest necessary to support the issuance of a writ compelling access has been found, for example, in the citizen's desire to keep a watchful eye on the workings of public agencies, ... and in a newspaper publisher's intention to publish information concerning the operation of government.
 
 
 16
 Nixon v. Warner Communications, Inc., 435 U.S. 589, 597-98, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570 (1978) (footnotes omitted).
 
 
 17
 Faced with the issue of whether a document may be classified as a "judicial document," and therefore accessible to the public, courts have applied varying standards. The Third Circuit has "focused on the technical question of whether a document is physically on file with the court." Pansy v. Borough of Stroudsburg, 23 F.3d 772, 782 (3rd Cir.1994) (holding that a Settlement Agreement never filed with, interpreted by, or enforced in the district court is not a judicial record accessible under the right of access doctrine). According to the Third Circuit, "[i]f [the document] is not [filed], it is not a 'judicial record.' " Id.; see also Bank of America Nat'l Trust & Sav. Ass'n v. Hotel Rittenhouse Assoc., 800 F.2d 339, 344-45 (3rd Cir.1986) ("Once a settlement is filed in the district court, it becomes a judicial record, and subject to the access accorded such records."); Leucadia, 998 F.2d at 161-62 (listing cases in which "other courts have also recognized the principle that the filing of a document gives rise to a presumptive right of public access.").
 
 
 18
 The First Circuit has taken a somewhat different approach. In Anderson v. Cryovac, Inc., 805 F.2d 1, 13 (1st Cir.1986), the court determined that documents must have a role in the adjudication process in order to be accessible and that documents that have no such role, such as those used in discovery, cannot be reached. In F.T.C. v. Standard Financial Management Corp., 830 F.2d 404 (1st Cir.1987), the court was faced with the issue of the accessibility of certain financial statements referred to in a proposed Consent Decree and requisitioned by the district court for use in deciding whether to approve the Decree. The court held as follows:
 
 
 19
 In sum, we find that the financial statements were germane to the approval process. They were duly submitted to the court in the course of that process. They were relevant and material to the matters sub judice. These facts lead inexorably to the conclusion that the district court relied upon the documents in assessing the reasonableness of the order, i.e., in determining the litigants' substantive rights, and in performing its adjudicatory function. The common law presumption of public access therefore attached to them.
 
 
 20
 Id. at 410.
 
 
 21
 We think that the mere filing of a paper or document with the court is insufficient to render that paper a judicial document subject to the right of public access. We think that the item filed must be relevant to the performance of the judicial function and useful in the judicial process in order for it to be designated a judicial document. With this definition in mind, we turn to Exhibit A of Report III filed by the Court Officer in this case and to the contention of Meyer, Suozzi that Exhibit A is not a judicial document.
 
 
 22
 While it is true that the Court Officer was not required to keep the court informed of the status of her investigation, she deemed it "prudent" to file reports, including confidential material, from time to time. During the argument before the district court on the motion for unsealing, the court stated that it received the Reports "to make sure that the court officer is doing what she was appointed to do--that is the only reason for my having to review it--and to make sure that the case doesn't go to sleep, but letting the court officer do what the court appointed her to do." It certainly was helpful to the court to know that the Court Officer was fulfilling the duties assigned to her by the Consent Decree in this case. Moreover, the Court Officer was vested with the powers of a Receiver, and it is hardly unusual for a Receiver to file status reports:
 
 
 23
 A receiver may often file progress or status reports which state the progress of the receivership, matters in litigation, the problems still to be resolved, and whatever else the receiver thinks important enough to be called to the attention of the court.
 
 
 24
 66 Am.Jur.2d, Receivers Sec. 349 (1973) (footnotes omitted).
 
 
 25
 The discharge of a Receiver is ordinarily a matter within the discretion of the district court, see Jones v. Village of Proctorville, 290 F.2d 49, 50 (6th Cir.1961) (per curiam), and whether that discretion should be exercised in favor of discharge or retention is informed by the regular filing of progress reports. The Consent Decree itself makes the reports and exhibits filed by the Court Officer relevant to the performance of the judicial function and useful in the judicial process. The Court Officer is permitted to apply for necessary and appropriate assistance to execute her powers, and the progress report certainly would be germane in assessing such an application. The Decree provides for any party to seek enforcement of, or relief from, any of the provisions of the Decree, and the court is empowered to grant relief "consider[ing] the record of all proceedings ... to the date of the application." The record to be considered surely would include the matters reported by the Court Officer. Although we never before have had the occasion to deal with the classification of documents such as those filed by the Court Officer here, we do not hesitate to classify her reports, including the exhibits filed under seal, as judicial documents subject to the common law presumption of public access. Our inquiry does not end at this point, however.
 
 II.
 
 26
 Although there is a presumption favoring access to judicial records, see Nixon v. Warner Communications, 435 U.S. at 602, 98 S.Ct. at 1314, the fact that a document is a judicial record does not mean that access to it cannot be restricted. According to the Supreme Court,
 
 
 27
 [i]t is uncontested ... that the right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes.
 
 
 28
 Id. at 598, 98 S.Ct. at 1312. As examples of documents to which access previously has been denied, the Court referred to records used to gratify spite or promote scandal and files that might "serve as reservoirs of libelous statements for press consumption." Id.
 
 
 29
 The Court in Nixon took note of the difficulties involved in "identify[ing] all the factors to be weighed in determining whether access is appropriate." Id. at 598-99, 98 S.Ct. at 1312. It also took note of the cases that have recognized "that the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." Id. at 599, 98 S.Ct. at 1312. Ultimately, the task of the courts is to "weigh[ ] the interests advanced by the parties in light of the public interest and the duty of the courts." Id. at 602, 98 S.Ct. at 1314.
 
 
 30
 Courts have weighed competing interests in a variety of contexts in determining whether to grant access to judicial documents. See e.g., United States v. Corbitt, 879 F.2d 224 (7th Cir.1989) (vacating district court's grant of access to presentence report); Times Mirror Co. v. United States, 873 F.2d 1210 (9th Cir.1989) (denying access to search warrant materials during preindictment investigation); F.T.C. v. Standard Financial Management Corp., 830 F.2d 404, 411-12 (1st Cir.1987) (granting access to financial records over claim of privacy intrusion); In re Nat'l Broadcasting Co., 653 F.2d 609 (D.C.Cir.1981) (granting access to tape recordings entered into evidence at a public trial); Application of Nat'l Broadcasting Co., 635 F.2d 945 (2d Cir.1980) (same). It has been observed that
 
 
 31
 [t]he public has in the past been excluded, temporarily or permanently, from ... the records of court proceedings to protect private as well as public interests: to protect trade secrets, or the privacy and reputation of victims of crimes, as well as to guard against risks to national security interests, and to minimize the danger of an unfair trial by adverse publicity.
 
 
 32
 In re Nat'l Broadcasting, 653 F.2d at 613.
 
 
 33
 We have recognized the law enforcement privilege as an interest worthy of protection. See In re Dep't of Investigation, 856 F.2d 481 (2d Cir.1988). This privilege is designed
 
 
 34
 to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation.
 
 
 35
 Id. at 484.
 
 
 36
 It is the desire of the Court Officer in this case to protect the identities of cooperating witnesses and others involved in her investigation, as well as to protect other confidential law enforcement information imparted to her and included in Exhibit A, that lies at the heart of the Court Officer's argument that access to her report should be restricted. Meyer, Suozzi premises its argument for restriction on a claim of privacy. Both the claims of law enforcement privilege and privacy are proper concerns for a trial court in performing the balancing test required to determine whether access should be allowed or denied. We do not perceive that there was any particular need here for the district court to have "discounted" the privacy claim merely because Meyer, Suozzi released to the press a memorandum setting forth the Court Officer's findings in regard to Mr. Ickes. Nor do we agree with the district court that the memorandum "suggest[ed] that a proposed appointment by the Executive was approved by the Court or screened under Court auspices."
 
 III.
 
 37
 While we think that it is proper for a district court, after weighing competing interests, to edit and redact a judicial document in order to allow access to appropriate portions of the document, we consider it improper for the district court to delegate its authority to do so. It is not apparent here whether the district court merely accepted the representations of the Court Officer with regard to the matters claimed to be inappropriate for release or made its own determination. What is clear is that the court released Exhibit A exactly as edited and redacted by the Court Officer and without making any written findings of its own.
 
 
 38
 It seems to us that the district court should make its own redactions, supported by specific findings, after a careful review of all claims for and against access. See In re New York Times Co., 834 F.2d 1152, 1154 (2d Cir.1987), cert. denied, 485 U.S. 977, 108 S.Ct. 1272, 99 L.Ed.2d 483 (1988). Such findings would provide us with a basis for effective review in the event of a future appeal. See Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 510, 104 S.Ct. 819, 824, 78 L.Ed.2d 629 (1984). The findings may be sealed to the extent that their articulation reveals information that should not be disclosed. United States v. Haller, 837 F.2d 84, 88 (2d Cir.1988).
 
 CONCLUSION
 
 39
 We affirm the judgment of the district court to the extent that it classifies Exhibit A as a judicial document subject to the common law right of access. We remand the case to the district court so that the district court may make its own determination, in accordance with the foregoing, whether access to Exhibit A or any part thereof should be restricted. The district court may make any redactions it deems appropriate after balancing the competing interests. Any restrictions on access should be supported by specific findings, and the burden will be upon Meyer, Suozzi to demonstrate that the interests favoring non-access outweigh those favoring access. The stay previously granted on consent will continue until further order of the district court.