**UNITED STATES of America,
Appellee,**

v.

**Darryl T. GRAHAM, Anthony F. Leonardo, Jr., Albert M. Ranieri, Defendants–Appellants.**

**WHEC–TV 10, WOKR–TV 13, Intervenors.**

**Docket Nos. 01–1106 to 01–1109.**

United States Court of Appeals, Second Circuit.

Argued April 26, 2001.

Decided July 16, 2001.

John F. Speranza, Rochester, NY (Attorney for Anthony F. Leonardo, Jr.), & Michael J. Tallon, Pittsford, NY (Attorney for Albert M. Ranieri) (Jay Ovsiovitch for William Clauss, Federal Defender, Western District of New York (Attorney for Darryl T. Graham) on the brief), for Defendants–Appellants.

Sharon P. Stiller, Underberg & Kessler LLP, Rochester, NY (Christopher D. Thomas, Nixon Peabody LLP, Rochester, NY, on the brief), for the Intervenors.

Before: JACOBS, PARKER, KATZMANN, Circuit Judges.

KATZMANN, Circuit Judge:

In this appeal, we are asked to determine whether the District Court for the Western District of New York (Larimer, *C.J.*) erred in ordering that copies of certain audio and video tapes presented by the government at a pretrial detention hearing be made available to members of the broadcast media. We hold that the tapes played at the pretrial hearing are "judicial records" subject to the common law right of copying and inspection, and that the defendants have not overcome the strong presumption in favor of access to the tapes. We therefore affirm the order of the district court and vacate the tempo-

rary stay of the district court's order issued by this Court pending this appeal.

## Background

On December 29, 2000, Darryl T. Graham, Anthony Leonardo, Jr., and Albert M. Ranieri were arrested by federal agents and charged with conspiracy to possess with intent to distribute and to distribute cocaine.[1] On that date, Magistrate Judge Jonathan W. Feldman ordered the defendants detained pending a detention hearing set for January 4, 2001. However, on January 4, a grand jury returned two indictments against the defendants. The first charged Mr. Leonardo and Mr. Graham with conspiracy to possess with intent to distribute and to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. § 846. The second charged Mr. Leonardo and Mr. Ranieri with an identical drug conspiracy count and with the use of a firearm in relation to a drug trafficking crime in violation of 21 U.S.C. § 924(c)(1). That same day, the defendants were arraigned and pleaded not guilty to the charges set forth in the indictments. The detention hearing was rescheduled for January 11, 2001.

On January 9, 2001, the defendants moved to seal the courtroom during the detention hearing, arguing that their right to a fair trial would be irreparably prejudiced if certain audio and video tapes that the government intended to present at the hearing were revealed to the public. The government opposed this motion. The Magistrate Judge notified the media of the motion, and invited them to intervene. Several press and broadcast media organizations accepted the invitation. The Magistrate Judge also ordered that the government submit under seal for *in camera*

---

1. Two days before oral argument on this appeal, Mr. Graham entered a guilty plea. At the present time, the charges against Mr. Ranieri and Mr. Leonardo are still pending.

review a proffer setting forth the evidence it intended to present at the hearing. Oral argument was held on January 12, 2001, and the Magistrate Judge issued an written decision later that day granting in part and denying in part the defendants' motion.

In his January 12, 2001 Decision and Order, the Magistrate Judge divided the evidence listed in the government's proffer into three categories. "Category One" encompassed factual allegations related to the charges then pending against the defendants. "Category Two" included allegations regarding a 1990 unsolved armored truck robbery. As noted by the Magistrate Judge, Mr. Ranieri had been the driver of the armored truck involved in that robbery. "Category Three" encompassed "factual allegations involving one or more of the defendants which have not been previously subject to disclosure to the public through the media or otherwise." In the words of the Magistrate Judge, "[t]his final category is unique in the sense that it alleges specific uncharged conduct that is of such a nature that . . . the defendants would have a strong legal and factual argument that it is irrelevant, if not inadmissible, on the charges currently set forth in the pending indictments."

The Magistrate Judge granted the defendants' motion with respect to the Category Three evidence, finding that the allegations comprising that category—which were "of the most serious nature"—were irrelevant to the charges pending against the defendants, and had yet to be disclosed to the public. He concluded that at that time, "there exist[ed] a very real danger that public dissemination of the category three evidence would create a substantial probability of prejudice to the defendants in this case."

By contrast, the Magistrate Judge found that the information contained in Categories One and Two was already, in one form or another, within the public domain. With respect to the allegations in Category One, the Magistrate Judge noted that the criminal complaints filed against the defendants "specifically refer to and describe meetings between and among the defendants, many of which also involve a confidential informant. . . . Indeed, the complaints describe the substance of many . . . conversations and contain inculpatory verbatim quotes of the defendants as they allegedly engage in drug trafficking activities." As for the information contained in Category Two, the Magistrate Judge stated that "[a]lthough the [armored truck] robbery occurred in 1990, media attention to the story and specifically concerning Albert M. Ranieri can be fairly described as extensive and unwavering." Given the already substantial reporting as to the allegations contained in Categories One and Two, the court denied the defendants motion as to those categories. The Magistrate Judge noted that counsel remained free to avail themselves of "alternative approaches" such as requests for intensive voir dire, additional peremptory challenges, or a change of venue "should they believe their clients' right to a fair trial is threatened by prejudicial pretrial media coverage."

Accordingly, the Magistrate Judge ordered that the courtroom remain open during the detention hearing, except for that portion of the hearing that concerned Category Three information, during which the courtroom would be closed. The defendants appealed the Magistrate Judge's order to Chief Judge David G. Larimer, and the media intervenors cross-appealed. Chief Judge Larimer conducted his own *in camera* review of the proffer material and, after oral argument held on January 16, 2001, orally affirmed the Magistrate Judge's order in all respects.

On January 18, 2001, the detention hearing was held before the Magistrate Judge. During the portion of the hearing held in open court, the government played excerpts from a number of audio and video tapes featuring conversations between and among the defendants and a confidential informant, Anthony P. Delmonti. After the defendants presented their evidence, the courtroom was closed so that the Magistrate Judge could consider the Category Three evidence. The following day, the Magistrate Judge ordered Mr. Graham detained based on his risk of flight, and ordered Mr. Leonardo and Mr. Ranieri detained because of the danger they would pose to the community if released. These orders were not appealed.

One week later, one of the media intervenors, WHEC TV–10, made a motion to the district court requesting that the court permit "the copying of all video tapes and audio tapes played during that part of defendants' detention hearing which was open to the public." A second media outlet, WOKR TV–13, joined in this motion shortly thereafter. The media intervenors did not seek to unseal the information regarding Category Three evidence, and did not request permission to copy tapes played during the portion of the detention hearing that had been closed to the public. The defendants opposed the motion. Finding that the defendants had failed to make a showing of prejudice substantial enough to overcome the strong presumption of access to judicial records long recognized in this Circuit, the district court granted the intervenors' motion and ordered the government to turn over copies of the tapes played at the open session of the detention hearing. On February 26, the district court denied the defendants an opportunity to reargue the motion, but did stay its order until 5:00 P.M. that day. On February 27, this Court ordered a further stay of the district court's order pending this expedited appeal.

## Appellate Jurisdiction and Standard of Review

Although the district court's order is not a final judgment, we have jurisdiction over the defendants' appeal from the order under the collateral order doctrine. *See generally Cohen v. Beneficial Indus. Loan Corp,* 337 U.S. 541, 545–47, 69 S.Ct. 1221, 93 L.Ed. 1528; *Whiting v. Lacara,* 187 F.3d 317, 319–320 (2d Cir.1999); *see also In re Application of Nat'l Broad. Co. (United States v. Myers),* 635 F.2d 945, 949 n. 2 (2d Cir.1980) (*"Myers"*). The collateral order doctrine, "a narrow exception to the general rule that interlocutory orders are not appealable as a matter of right," *see Schwartz v. City of New York,* 57 F.3d 236, 237 (2d Cir.1995), " 'is limited to trial court orders affecting rights that will be irretrievably lost in the absence of an immediate appeal,' " *see Whiting,* 187 F.3d 317, 319 (quoting *Richardson–Merrell, Inc. v. Koller,* 472 U.S. 424, 430–31, 105 S.Ct. 2757, 86 L.Ed.2d 340 (1985)). To fit within the collateral order exception, the interlocutory order must: "[i] conclusively determine the disputed question, [ii] resolve an important issue completely separate from the merits of the action, and [iii] be effectively unreviewable on appeal from a final judgment." *See Whiting,* 187 F.3d at 319 (quoting *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978) (internal quotation marks omitted)); *see also Cohen,* 337 U.S. at 545–47, 69 S.Ct. 1221. In *Myers,* we suggested, without finding, that because an order allowing the copying of tapes played during a court proceeding "involves alleged rights of the networks as third parties to the criminal litigation and since the deferral of a ruling on their claim until appeal from the judgments of conviction would further deny them the relief they

seek—namely, contemporaneous televising of the tapes, *Cohen* very likely applies." For those same reasons, we find that the order of the district court falls within the collateral order exception.

Before moving on to the merits, we pause to consider the applicable standard of review. Notwithstanding the number of cases in this and other Circuits which address the common law right of access to judicial records, there seems to be little consensus regarding the standard of review applicable in appeals such as this one. *See Myers*, 635 F.2d at 950 n. 3 (noting the lack of clarity regarding the standard of review under *Nixon v. Warner Commun., Inc.*, 435 U.S. 589, 602, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1979)); *United States v. Criden*, 648 F.2d 814, 816–819 (3d Cir.1981) (discussing alternative standards). As this Court observed in *Myers*, the uncertainty arises in large part from the Supreme Court's opinion in *Warner Communications*, which "refers to the need for the trial court to exercise an informed discretion [but] also says that, in the absence of a statute 'we' would be faced with the task of weighing the competing interests." *Myers*, 635 F.2d at 950 n. 3 (discussing *Warner Commun.*, 435 U.S. at 602, 98 S.Ct. 1306). Thus, it is unclear from the language of that opinion whether we should review only for abuse of discretion, or whether a more searching review is warranted.

In two of the leading cases in this Circuit, *Myers* and *In re Application of CBS, Inc.*, 828 F.2d 958 (2d Cir.1987) (*United States v. Salerno*) ("*Salerno*"), we declined to resolve the question. In *Myers*, the standard of review was not crucial to our decision to affirm the district court. In *Salerno*, we reversed the district court, stating that "[a]lthough the determination of whether circumstances exist that justify a restriction on access to evidence in a particular case is committed to the trial court's discretion, that discretion is limited by the strength of the presumption of public access. We believe that the circumstances relied upon by the district court in the present case do not overcome that presumption." *Salerno*, 828 F.2d at 960–61. Thus, in *Salerno*, the Court was not explicit as to whether it was reviewing merely for abuse of discretion or employing a more stringent standard of review.

No consensus exists among our sister circuits on this issue. The Fifth Circuit has read *Warner Communications* as requiring review for abuse of discretion, *see Belo Broadcasting Corp. v. Clark*, 654 F.2d 423, 430 (5th Cir.1981); *see also United States v. McDougal*, 103 F.3d 651, 657 (8th Cir.1996) (reviewing for abuse of discretion). The Third and Sixth Circuits, however, have argued that a more searching review is appropriate. *See Criden*, 648 F.2d at 819; *United States v. Beckham*, 789 F.2d 401, 412–13 (6th Cir.1986). In *Criden*, the Third Circuit noted that "[t]he justifications for committing decisions to the discretion of the court are not uniform, and may vary with the specific type of decisions. Although the standard of review in such instances is generally framed as 'abuse of discretion,' in fact the scope of review will be directly related to the reason why that category or type of decision is committed to the trial court's discretion in the first instance." *Criden*, 648 F.2d at 817. It went on to state that "where the basis for commitment of a decision to a trial court's discretion is not dependent on its observation or familiarity with the course of the litigation, there are less compelling reasons for limited appellate review." *Criden*, 648 F.2d at 818. Finding that "the decision whether to release the tapes was not dependent in the main on particular observations of the trial court," *id.*, the Third Circuit found that the task of the appellate court when reviewing a re-

quest to copy tapes is to determine "whether the relevant factors were considered and given appropriate weight," *id.* at 819. The Sixth Circuit has adopted this approach. *See Beckham,* 789 F.2d at 412–13.

Given the ambiguous language of *Warner Communications* itself, the choice between the two approaches taken by our sister circuits in addressing this question is a difficult one. It is, however, a choice that we will leave for another day. Because, for the reasons set forth below, we would affirm the district court's decision under either an abuse of discretion standard or the more stringent standard recommended by the Third and Sixth Circuits, we need not decide at this time which standard of review is the more appropriate one.

**Discussion**

*A. The Common Law Right to Inspect and Copy Judicial Records*

■ While "[t]he existence of the common law right to inspect and copy judicial records is beyond dispute," *Myers,* 635 F.2d at 949, it is equally clear that that right "is not absolute," *Warner Commun.,* 435 U.S. at 598, 98 S.Ct. 1306. As we noted in *Myers,* our approach with respect to the common law right in the criminal context is shaped both by our responsibility to ensure that criminal defendants are not deprived of their right to a fair trial and by our recognition that "[w]hat transpires in the court room is public property." *Myers,* 635 F.2d at 951 (quoting *Craig v. Harney,* 331 U.S. 367, 374, 67

S.Ct. 1249, 91 L.Ed. 1546 (1947)). Thus, as we proceed, we must keep in mind both the singular importance of protecting the rights of criminal defendants and the particular interest of the public in scrutinizing the operation of our criminal justice system. As the Supreme Court stated in *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), and as we reiterated in *Myers,* it is "difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted." *Myers,* 635 F.2d at 951 (quoting *Richmond Newspapers,* 448 U.S. at 575, 100 S.Ct. 2814).

■ In *Myers,* we held that there was a "strong presumption" in favor of allowing the public to inspect and copy "any item entered into evidence at a public session of a trial." *Myers,* 635 F.2d at 952. In so holding, we reasoned that "[o]nce the evidence has become known to the members of the public, including representatives of the press, through their attendance at a public session of court, it would take the most extraordinary circumstances to justify restrictions on the opportunity of those not physically in attendance at the courtroom to see and hear the evidence, when it is in a form that readily permits sight and sound reproduction." *Id.* We noted, however, that this presumption would not apply to evidence submitted under seal, "because, with respect to that item of evidence, the session of court was not public." *Myers,* 635 F.2d at 952 n. 4.[2]

We subsequently articulated a somewhat more context-specific understanding of the

**2.** The defendants suggest that our the standard set forth in *Myers* is at odds with the approach taken by the Supreme Court in *Warner Communications,* and invite us instead to follow the example of certain of our sister circuits, which have rejected the use of a "strong presumption" in favor of a weaker one. *See United States v. McDougal,* 103 F.3d

651, 657 (8th Cir.1996); *United States v. Webbe,* 791 F.2d 103, 106 (8th Cir.1986); *United States v. Beckham,* 789 F.2d 401, 414 (6th Cir.1986); *Wilson v. American Motors,* 759 F.2d 1568, 1571 (11th Cir.1985); *Belo Broad. Corp. v. Clark,* 654 F.2d 423, 433–34 (5th Cir.1981). *But see United States v. Guzzino,* 766 F.2d 302, 304 (7th Cir.1985) (apply-

weight to be given to the presumption in favor of access to judicial records, finding that "the weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts." *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir.1995) ("*Amodeo II*"); *see United States v. Glens Falls Newspapers*, 160 F.3d 853, 857 (2d Cir.1998) (consider-

the appropriate weight to be given to the presumption of public access with respect to settlement documents). "Generally," we stated, "the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance." *Amodeo II*, 71 F.3d at 1049.

■ In *Amodeo II*, we noted that the presumption had been given great weight

ing "strong presumption"); *United States v. Criden*, 648 F.2d 814, 823 (3rd Cir.1981) (same); *see also In re Nat'l Broad. Co. (United States v. Jenrette)*, 653 F.2d 609, 613 (D.C.Cir. 1981) ("[A]ccess may be denied only if the district court, after considering 'the relevant facts and circumstances of the particular case,' and after 'weighing the interests advanced by the parties in light of the public interest and the duty of the courts,' concludes that 'justice so requires' "). We decline the invitation.

As explained in the main body of the opinion, we do not undertake our review of the district court's order based solely on the "strong presumption" in *Myers*. Rather, we determine the weight of the presumption in light of "the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts," *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir.1995) ("*Amodeo II*"), an analysis wholly in keeping with the approach taken by the Supreme Court in *Warner Communications*.

While *Myers* is not the only case applicable to our analysis, we take this opportunity to confirm the continued vitality of that decision. We begin by noting that while the Supreme Court did confirm the existence of the common law right in *Warner Communications*, it did not precisely define the contours of that right or specify how the interests should be balanced, instead resolving the case before it on statutory grounds. *See Warner Communications*, 435 U.S. at 603, 98 S.Ct. 1306. For example, the Court stated that it was "difficult to distill from the relatively few judicial decisions a comprehensive definition of what is referred to as the common-law right of access or to identify all the factors to be weighed in determining whether access is appropriate." *Id.* at 598–99, 98 S.Ct. 1306.

The Court also signaled its reluctance to precisely define the right when it stated that one of the factors to be weighed in the balancing of interests was "the presumption—however gauged—in favor of public access to judicial records." *Id.* at 602, 98 S.Ct. 1306. Thus, while *Warner Communications* made it clear that a presumption exists in favor of the inspection and copying of judicial records, it left unanswered key questions regarding the strength of the presumption and its application. *See United States v. Edwards*, 672 F.2d 1289, 1293 (7th Cir.1981). While the "strong presumption" used by this and other courts was not announced in *Warner Communications*, its use in no way conflicts with the broad principles set forth in that opinion. We do not agree with the defendants that the use of a strong presumption in favor of access with regard to evidence introduced at trial is at odds with the Supreme Court's statement that such decisions are "best left to the sound discretion of the trial court ... in light of the relevant facts and circumstances of the particular case." *Warner Commun.*, 435 U.S. at 602, 98 S.Ct. 1306.

Moreover, while the common law right is not constitutional in dimension, it "supports and furthers many of the same interests which underlie those freedoms protected by the Constitution." *Edwards*, 672 F.2d at 1294; *see also United States v. Mitchell*, 551 F.2d 1252, 1258 (D.C.Cir.1976), *rev'd on other grounds sub nom. Nixon v. Warner Commun., Inc.*, 435 U.S. 589, 602, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) (noting the common interests served by the common law right and by the First, Fifth, and Sixth Amendments). In our view, the importance of the interests served by the common law right justifies the heightened presumption set forth in *Myers* with respect to evidence presented at trial.

by this and other courts where the requested documents had been introduced at trial (as in *Myers* and *Salerno*) or had otherwise been material to a court's disposition of a case on the merits. *See id.* (also citing *Joy v. North,* 692 F.2d 880 (2d Cir.), *cert. denied sub nom. Citytrust v. Joy,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1982) (vacating a protective order entered with respect to a report that was material to the district court's grant of summary judgment)); *FTC v. Standard Fin. Mgmt. Corp.,* 830 F.2d 404, 408–09 & n. 5 (1st Cir.1987) (favoring public access to documents submitted in connection with a consent decree that were "material and important" to the district court's decision to approve the settlement). "In each of these cases," we found, "the strong weight to be accorded the public right of access to judicial documents was largely derived from the role those documents played in determining litigants' substantive rights-conduct at the heart of Article III-and from the need for public monitoring of that conduct." *See id.* Conversely the presumption of access to documents that do not serve as the basis for a substantive determination-such as documents submitted on a motion for summary judgment which is denied, thus leaving a decision on the merits for another day—is appreciably weaker. *See id.* at 1050. The weakest presumption is given to documents such as preliminary settlement documents, which have not yet been submitted to a court for ratification. *See Glens Falls Newspapers,* 160 F.3d at 857. Such documents "play a 'negligible role' in the trial judge's exercise of Article III judicial power until they are merged into a tentative final agreement for court action, thereby becoming public." *See id.*

■  Discerning the weight of the presumption with respect to judicial documents falling between these extremes on the continuum is a matter of judgment. "That judgment can be informed in part by tradition. Where such documents are usually filed with the court and are generally available, the weight of the presumption is stronger than where filing with the court is unusual or is generally under seal." *Amodeo II,* 71 F.3d at 1050.

### B. Whether the Tapes Are Judicial Records Subject to the Common Law Right

■  On appeal, the defendants contend that, because the tapes[3] played at the pretrial detention hearing were not entered into evidence, they are not "judicial records."[4] We disagree.

First, we note that while the transcript of the detention hearing indicates that the tapes were merely marked for identification, and not formally admitted into evidence, it is clear from the district court's order that the court relied substantially on the tapes in making its bail determinations. Moreover, it is clear that, had any

---

**3.** Although the word "documents" might normally suggest that the common law right applied only to written material, it has been held to apply to audio and video tapes. *See Myers,* 635 F.2d at 949; *see also Warner Communications,* 435 U.S. at 599, 98 S.Ct. 1306 (assuming, without deciding, that the common law right applied to the tapes at issue in that case).

**4.** The intervenors suggest that the defendants have waived this argument, having failed to

raise it below. "Although it is the general rule ... that a federal appellate court does not consider an issue not passed upon below, the matter of what questions may be taken up ... for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Ford v. Bernard Fineson Dev. Ctr.,* 81 F.3d 304, 307 (2d Cir.1996) (internal quotation marks and citations omitted).

of the defendants appealed the district court's decision to hold them in custody pending trial, both the parties and this Court would have considered the tapes played at the hearing a part of the record on appeal.[5] Thus, while the defendants are correct that the words "admitted into evidence" were not used at the hearing, the distinction appears to us to be at most a semantic one, given the presentation of the tapes at the hearing and the district court's reliance on them in making its decision.

Even assuming that the tapes were not for all practical purposes admitted into evidence, we do not agree with the defendants that they are beyond the reach of the common law right to inspect and copy judicial records. In *United States v. Amodeo,* 44 F.3d 141 (2d Cir.1995) ("*Amodeo I*"), we considered whether the common law right applied to reports filed by a court officer pursuant to a consent decree in a RICO case. Rejecting the view that this Court could answer this question simply by determining whether the document was physically on file with the court, we defined the term "judicial document" as follows: "[T]he item filed must be relevant to the performance of the judicial function and useful in the judicial process in order for it to be designated a judicial document." *See id.* at 145. Having determined that the officer's reports did serve a judicial function—that of informing the court of the officer's actions and providing a basis for possible rulings with respect to the consent decree—we found that the reports were judicial documents. *See id.; see also United States v. Suarez,* 880 F.2d

626, 631 (2d Cir.1989) (finding that forms submitted by appointed counsel requesting payment were judicial documents). Nowhere did we imply that the term "judicial document" applied only to evidence admitted at trial.

The First, Third, and Seventh Circuits have all similarly held that the common law right applies not only to items in evidence, but rather more generally to "materials on which a court relied in determining the litigants' substantive rights," which may include "transcripts of proceedings [and] everything in the record, including items not admitted into evidence." *Smith v. United States Dist. Ct.,* 956 F.2d 647, 650 (7th Cir.1992); *see FTC v. Standard Fin. Mgmt. Corp.,* 830 F.2d 404, 408 (1st Cir.1987) (distinguishing "materials on which a court relied in determining the litigants' substantive rights" from "[t]hose documents which play no role in the adjudication process ... such as those used only in discovery"); *United States v. Martin,* 746 F.2d 964, 968 (3d Cir.1984) (noting that "[t]he common law right of access is not limited to evidence, but rather encompasses all 'judicial records and documents' ").

Moreover, in discussing the scope of the common law right, the Supreme Court in *Warner Communications,* 435 U.S. at 598–99, 98 S.Ct. 1306, referred to "judicial records and documents" and to the courts' supervisory power over their own "records and files." This would be an odd way to say "evidence at trial," as the defendants would have us read the Court's language, and we have no reason to assign such an

---

**5.** The defendants suggest that the tapes cannot be considered "judicial records" because they are not in the custody of the Clerk, but rather in the hands of the prosecutor. However, it is common for the parties to retain custody of their own trial exhibits and, as we find below, the tapes became public by virtue

of having been played in open court. We do not have occasion to address the question whether a defendant could be ordered to provide to the press copies of documents in his possession, as only documents held by the government are at issue here.

unnatural meaning to those words. As the Seventh Circuit has explained, "the policy behind the common law presumption of access is that what transpires in the courtroom is public property." *Smith,* 956 F.2d at 650; *see Craig v. Harney,* 331 U.S. 367, 374, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947). In effect, the common law right functions to extend the right of the public to attend court proceedings to include the inspection of evidence presented at those proceedings. Thus, just as a member of the public sitting in the courtroom might observe the presentation of evidence as to which an objection is made and sustained as well as evidence which is admitted, it makes sense that the definition of a "judicial document" would extend to any material presented in a public session of court "relevant to the performance of the judicial function and useful in the judicial process" whether or not it was formally admitted. *Amodeo I,* 44 F.3d at 146.

Our view is in no way undermined, as the defendants suggest, by our statement in *Myers* that we had "no occasion to consider the different issues that would arise if evidence of questionable admissibility were marked only for identification." *Myers,* 635 F.2d at 952. Read in the context of the preceding sentence, which focused on the fact that the tapes' "sights and sounds had been seen and heard by those in the courtroom, and the common law privilege of public inspection and copying had fully attached to them," it is clear that our mention of "evidence ... marked only for identification" refers to evidence which is never presented in open court. *See id.*

Because we find that the question whether the tapes at issue are judicial documents within the meaning of the common law privilege identified in *Warner Communications* does not turn on whether they were formally admitted as evi-

dence, we must return to the more general question whether they are "relevant to the performance of the judicial function and useful in the judicial process." *Amodeo I,* 44 F.3d at 146. We find that they are. As mentioned above, although there is some confusion regarding whether the district court considered the tapes to be formally entered into evidence, there can be no doubt that the tapes were instrumental in its decision to detain the defendants. Indeed, the discussion of the tapes is the focal point of the court's decision. Moreover, the decision whether to detain the defendants obviously constituted a determination of the defendant's "substantive rights." We therefore conclude that the tapes are "judicial documents" for the purposes of the common law right.

## C. The Weight of the Presumption of Access

We must next consider what weight to give the presumption of access in connection with documents presented at a pretrial detention hearing. As we discussed in *Amodeo II,* the central concern is the role the tapes at issue played in the district court's exercise of its Article III powers. *See Amodeo II,* 71 F.3d at 1049. Under our analysis in *Amodeo II,* documents that "directly affect an adjudication" and play a significant role in "determining litigants' substantive rights," *see id.,* receive the benefit of a relatively strong presumption, while the public interest in other documents "is not as pressing," *see id.* (quoting *In re Reporters Comm. For Freedom of the Press,* 773 F.2d 1325, 1342 n. 3 (D.C.Cir.1985) (J. Skelly Wright, concurring in part and dissenting in part)). In assessing the presumption to be applied to documents in the middle of this continuum, we look to whether such documents "are usually filed with the court and are generally available." *Id.* at 1050.

■ The tapes at issue here clearly "directly affect[ed] an adjudication" and were material to the district court's determination of the defendants' "substantive rights." Indeed, as discussed above, they were the primary basis for the district court's decision to detain the defendants pending trial. Therefore, it is appropriate to apply a strong presumption of access, such as that applied in *Myers*. *See id.*

■ Moreover, even if we were to find that the tapes were situated toward the middle of the continuum described in *Amodeo II*, we would be inclined to give substantial weight to the presumption of access. The detention of criminal defendants pending trial is a quintessential exercise of a court's Article III judicial power, and the public has a legitimate interest in monitoring a court's use of that power. *See, e.g. In re Globe Newspaper Co.*, 729 F.2d 47, 52 (1st Cir.1984) ("[T]he bail decision is one of major importance to the administration of justice, and openness will help to assure the public that the decision is properly reached."); *United States v. Chagra*, 701 F.2d 354, 363 (5th Cir.1983) ("Pretrial release proceedings require decisions that attract significant public interest and invite legitimate and healthy public scrutiny."). Barring a successful motion to close the courtroom, pretrial detention hearings are open to the public. *See In re Globe Newspaper Co.*, 729 F.2d at 52; *Chagra*, 701 F.2d at 363; *United States v. Gotti*, 753 F.Supp. 443, 444 (E.D.N.Y.1990); *cf. In re Application of The Herald Co.*, 734 F.2d 93, 98 (2d Cir.1984) (noting, in the context of a suppression hearing, a public right of access to pretrial hearings). In the instant case, the defendants have not appealed the district court's decision to allow Category One and Two tapes to be played in open court, and the intervenors have not requested copies of the Category Three tapes played after the courtroom was closed. Thus, there is nothing to lead us to think that we should treat materials introduced in the pretrial detention hearing in this case differently than those introduced in any other such hearing held in open court. Given the considerable public interest in scrutinizing the courts' exercise of authority in the context of pretrial detention hearings, the traditionally public nature of such hearings, and the centrality of the tapes at issue to the district court's decision to detain the defendants in the instant case, we find that the district court did not err in applying the "strong presumption" of *Myers* to the tapes at issue here.

### D. Countervailing Factors to be Balanced Against the Presumption of Access

■ The defendants contend that allowing the intervenors to copy the tapes played at the pretrial hearing will violate their right to a fair trial by, in effect, tainting the pool of potential jurors. They argue that if the conversations on the tapes were broadcast to the public at large, potential jurors would be likely to arrive at a verdict based not only on the evidence presented at trial, but also on the prejudicial material contained in the tapes. The right of the defendants to a fair trial is of the utmost importance, and the defendants' claim is not one we treat lightly. As we stated above, the common law right is not absolute, and must bow to the defendants' fair trial right if the two rights are irreconcilable; that is, countervailing factors may overcome the presumption of access.

However, as noted by the district court, alternative remedies exist to ensure that the defendants receive a fair trial, ranging from a more searching voir dire to a change of venue. As we stated in *Myers,*

which concerned the high-profile Abscam scandal:

> We do not doubt the premise of this claim that televising the tapes will greatly increase the number of people with knowledge of their content beyond those already aware of the videotaped events through reading press accounts and viewing television newscasts. Nor do we doubt that seeing the tapes on television will create a stronger impression of the events among those who already have been exposed to news accounts of their contents.
>
> We disagree, however, that the likelihood of such enhanced awareness of the tapes poses the kind of risk to fair trials for [the] defendants that justifies curtailing the public's right of access to courtroom evidence. Defendants, as well as the news media, frequently overestimate the extent of the public's awareness of the news.... Even the intensive publicity surrounding the events of Watergate, very likely the most widely reported crime of the past decade, did not prevent the selection of jurors without such knowledge of the events as would prevent them from serving impartially.

*Myers*, 635 F.2d at 953. Likewise, we agree with the district court that while the events surrounding the instant case have gained some notoriety, the possibility that the jury pool will become so tainted as to prevent the defendants here from obtaining fair trials is "too speculative to justify denial of the public's right to inspect and copy evidence presented in open court." *Id.* at 954. As the district court found both on the defendants' motion to close the courtroom and on their opposition to the application of the intervenors to copy the tapes, there has already been extensive reporting on the events to which the Category One and Two tapes are relevant.

The district court thoughtfully expressed some concern that the intervenors (and, consequently, the public) would have access to evidence which might be the subject of a successful suppression motion before trial. However, in *Myers*, as the district court correctly noted, we found that the speculative effect of the tapes on the trials of future defendants in that case was not sufficient to overcome the presumption of access. *See id.* at 953–54. We stated: "We do not believe the public at large must be sanitized as if they all would become jurors in the remaining Abscam trials. The alleged risk to a fair trial for the Abscam defendants is too speculative to justify denial of the public's right to inspect and copy evidence presented in open court." *Id.* The situation of the defendants here is analogous to that of the subsequent defendants in *Myers*.

Moreover, there was no indication, at the time of oral argument, that any of the defendants intended to file a motion in limine seeking to prevent the use of the tapes at trial. Were we faced with a situation in which there had been little or no pretrial publicity of the charges against the defendants, and in which some portion of the evidence was clearly inflammatory and unlikely to be admitted at trial, we might come to a different conclusion, although the strong presumption of access to evidence aired in open court during a detention hearing would remain. However, as the Category Three evidence—which by all accounts may fit that description—is not at issue, we are not faced with that question here.

## Conclusion

In short, because we agree with the district court that the remedies of voir dire and change of venue are sufficient to address any potentially prejudicial effects of the additional publicity that will result

from the broadcast of the tapes, we find that the court did not err in concluding that the defendants had failed to overcome the strong presumption in favor of access to these judicial documents. We therefore affirm the district court's order, and lift the stay of that order entered pending appeal.