**CRANE HELICOPTER SERVICES, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 93–322C.

United States Court of Federal Claims.

April 28, 2003 [1].

The defendant requested that the exhibits and trial transcripts identified in the order remain under seal. The court has redacted references to the trial exhibits and testimony in the order prior to publication. Redactions are indicated by the word REDACTED in brackets.

Christopher B. Ingram, Haas & Najarian, San Francisco, CA, counsel for plaintiff.

Deborah P. Samuel, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., counsel for defendant, with whom was David M. Cohen, Director, United States Department of Justice, Civil Division, Commercial Litigation Branch.

## ORDER

HORN, Judge.

The remaining issue before the court is whether certain exhibits and testimony placed into the record under seal during the trial on defendant's fraud counterclaim should remain sealed to protect the asserted trade secrets of a nonparty, Bell Helicopter Textron Inc. (Bell). Bell and the defendant have submitted a list of those portions of the record they believe should remain sealed. Pursuant to the following discussion, the court finds that most, but not all, of the portions of the record identified by Bell and the defendant constitute trade secrets which should remain sealed. The remainder of the record may be made available to the public.

## FINDINGS OF FACT

The above captioned case originally came before the court as a claim for damages against the United States arising out of a forest fire suppression contract which the government awarded to plaintiff, Crane Helicopter Services, Inc. (Crane). *Crane Helicopter Servs., Inc. v. United States,* 45 Fed. Cl. 410, 411 (1999). Defendant asserted a counterclaim alleging that plaintiff had committed fraud by falsely representing its helicopter as a civilian helicopter in order to obtain the forest fire suppression contract. *Id.* at 411–12. The court held a trial on defendant's counterclaim to determine whether plaintiff's aircraft was a civilian Bell 204B "Super" and, if that the aircraft was not a civilian Bell 204B "Super," whether plaintiff had acted in reckless disregard of that fact by identifying its aircraft to the government as a Bell 204B "Super." *Id.* The court found in favor of the plaintiff on both issues. *Id.* at 450.

During the trial of defendant's fraud counterclaim, the government attempted to show that plaintiff's helicopter was a military model of the Bell UH–1 helicopter series and not a commercial Bell 204B "Super" helicopter. *Id.* at 429. The Bell 204B helicopter was based on the design of the Bell UH–1 series helicopter used by the military. As a result, a portion of the testimony and exhibits offered by the parties at trial concerned the differences between the military models of the Bell UH–1 series helicopter and the commercial Bell 204B helicopter. As stated in the court's opinion denying defendant's fraud counterclaim, the Report of Findings written

by defendant's expert witness, Frederic Wilken, summarizes the issues regarding the differences between the commercial Bell 204B "Super" helicopter and the military models of the Bell UH–1 helicopters, and is useful in placing the current dispute regarding trade secrets into context:

> During the 1960's and 1970's, Bell Helicopter produced several military models of helicopters identified as the UH–1 Series Helicopter. They were designed to U.S. Military specifications and requirements. The military established the service life and overhaul requirements for all component parts. The military dictated the procedures that would be followed while maintaining the airworthiness of the helicopter.

> When Bell Helicopter manufactured the commercial Bell 204–B Series Helicopter and it was offered for commercial use, Bell was required to submit the design details along with service requirements to the Federal Aviation Administration ("FAA") for approval. After FAA review and validation, a Type Certificate was issued which allowed the helicopter to operate commercially and carry passengers. The military UH–1 Series Helicopters have not received Federal Aviation Administration review or approval to carry passengers. The UH–1 Series Helicopters are certified in a restricted category and are not considered safe to carry passengers by Federal Aviation Administration standards.

> The Federal Aviation Administration has regulations for certifying aircraft for commercial use. The regulations are identified at 14 CFR Part 21 "Certification Procedures for Products and Parts". [They] provide[ ] procedural requirements for the issuance of Type Certificates. In the case of the UH–1 Series Helicopter, the Federal Aviation Administration ... does not allow for the transportation of passengers. Because of the different treatment of UH–1 and Bell 204–B Series Helicopter[s] by the FAA, individuals and companies have attempted to modify the UH–1 Series Helicopter to resemble a commercial Bell 204–B Series Helicopter. In addition, when a commercial Bell 204–B Series Helicopter is damaged beyond cost effective repair, major UH–1 Series Helicopter airframe components are used as uncertified replacements. This would include tail booms and the entire fuselage. The helicopter's data plate is removed from the wrecked helicopter and reinstalled on the modified military airframe. The company or individual modifies the airframe of the helicopter to hide the obvious differences and resells it as the original commercial Bell 204–B Series Helicopter that crashed.

*Id.* at 429–30. The regulations at 14 C.F.R. § 21.183 (2001) detail the conditions which must be met for the issuance of standard airworthiness certificates for most types of aircraft:

(a) *New aircraft manufactured under a production certificate.* An applicant for a standard airworthiness certificate for a new aircraft manufactured under a production certificate is entitled to a standard airworthiness certificate without further showing, except that the [FAA] Administrator may inspect the aircraft to determine conformity to the type design and condition for safe operation.

(b) *New aircraft manufactured under type certificate only.* An applicant for a standard airworthiness certificate for a new aircraft manufactured under a type certificate only is entitled to a standard airworthiness certificate upon presentation, by the holder or licensee of the type certificate, of the statement of conformity prescribed in § 21.130 if the Administrator finds after inspection that the aircraft conforms to the type design and is in condition for safe operation.

\*   \*   \*   \*   \*   \*

(d) *Other aircraft.* An applicant for a standard airworthiness certificate for aircraft not covered by paragraphs (a) through (c) of this section is entitled to a standard airworthiness certificate if—

(1) He presents evidence to the Administrator that the aircraft conforms to a type design approved under a type certificate or a supplemental type certificate and to applicable Airworthiness Directives;

(2) The aircraft ... has been inspected in accordance with the performance rules for

100–hour inspections set forth in § 43.15 of this chapter and found airworthy by—

(i) The manufacturer;

(ii) The holder of a repair station certificate as provided in Part 145 of this chapter;

(iii) The holder of a mechanic certificate as authorized in Part 65 of this chapter; or

(iv) The holder of a certificate issued under Part 121 or 127 of this chapter, and having a maintenance and inspection organization appropriate to the aircraft type; and

(3) The Administrator finds after inspection, that the aircraft conforms to the type design, and is in condition for safe operation.

The importance of the type certificate, in turn, is demonstrated through its definition in 14 C.F.R. § 21.41 (2001):

Each type certificate is considered to include the type design, the operating limitations, the certificate data sheet, the applicable regulations of this subchapter with which the Administrator records compliance, and any other conditions or limitations prescribed for the product in this subchapter.

At trial, defendant's expert in aviation related matters, Mr. Wilken, explained the significance of the type and airworthiness certificates:

The FAA has a system where a company can present an aircraft to the FAA with all the details about that aircraft, and that company can be awarded the rights to produce that aircraft. The aircraft is evaluated. Its design is evaluated by the FAA. All the drawings, the blueprints, the heart of the helicopter, are produced for the FAA. They're all evaluated by FAA engineers and in this case, the helicopter directorate of the FAA is in Ft. Worth, Texas. So, [after approval] the FAA issues a type certificate to this specific helicopter, the 204B. The type certificate H1SW is the identifier for the 204B type certificate.

... That gives the manufacturer the authorization to build the helicopter on his own. He can produce it, he can follow the blueprints, he can build it. He can test fly it. He can then present it to FAA-authorized individuals to issue what is called an air worthiness certificate. The air worthiness certificate is issued at the completion of the building of the helicopter and [after] all the tests that are performed.

What the air worthiness certificate means is that the helicopter is safe to fly.

Mr. Wilken further clarified the process: "You have to build the helicopter, you have to fly the helicopter, you have to comply with the type certificate requirements and the design drawings in building the helicopter. When that's all complete and the helicopter is inspected from top to bottom, then an airworthiness certificate is issued [for the individual helicopter.]"

Finally, the FAA also has promulgated regulations affecting the use and manufacture of replacement parts:

(a) Except as provided in paragraph (b) of this section, no person may produce a modification or replacement part for sale for installation on a type certificated product unless it is produced pursuant to a Parts Manufacturer Approval issued under this subpart.

(b) This section does not apply to the following:

(1) Parts produced under a type or production certificate.

(2) Parts produced by an owner or operator for maintaining or altering his own product.

(3) Parts produced under an FAA Technical Standard Order.

(4) Standard parts (such as bolts and nuts) conforming to established industry or U.S. specifications.

\*     \*     \*     \*     \*     \*

(d) An applicant is entitled to a Parts Manufacturer Approval for a replacement or modification part if—

(1) The Administrator finds, upon examination of the design and after completing all tests and inspections, that the design meets the airworthiness requirements of the Federal Aviation Regulations applica-

ble to the product on which the part is to be installed; and

(2) He submits a statement certifying that he has established the fabrication inspection system required by paragraph (h) of this section.

14 C.F.R. § 21.303.

Prior to the trial on defendant's fraud counterclaim, both parties requested information from Bell regarding the differences between the Bell UH–1 series helicopter and the Bell 204B helicopter. Bell regards certain drawings, design criteria, specifications, photographs, and technical information relating to the design of the Bell 204B helicopter, and the differences in design between the 204B and the Model UH–1 series of helicopters, to be proprietary and confidential material. Prior to the trial, during discovery, the plaintiff and the government entered into a protective agreement with Bell to allow the parties to have access to the information that Bell considered proprietary. At the beginning of the trial, a motion was presented to the court to enter a protective order to seal certain documents and testimony which, allegedly, constitute trade secrets. Counsel for Bell was present and participated in discussions with the court concerning the proposed substance of the protective order.

The court issued a protective order on December 23, 1996. The scope of the protective order was described in Section 1, which states:

> For purposes of this order, the term "proprietary information" shall be considered synonymous with "trade secret" as defined by § 1(4) of the Uniform Trade Secrets Act and shall include, without limitation, those documents previously tendered by Mr. [Tony] Stier,[2] and such documents as may be subpoenaed from Bell Helicopter, and the testimony of Mr. Stier or any other employees of Bell Helicopter that constitute or contain the following:
>
> 1. Trade secret information regarding the design of the 204B model helicopter;
>
> 2. Trade secret information regarding all of the UH–1 model helicopters (including, but not limited to UH–1A through UH–1N models) and other models identified by Mr. Stier which do not bear the identifying letters "UH" but fall within the UH design;
>
> 3. Trade secret information regarding the differences between the 204B and any other model of helicopter manufactured by Bell Helicopter or any of its predecessor entities;
>
> 4. Any testimony relating to a document entitled "Differences Between the 204B and the UH–1B" (Exhibit 9 to Mr. Stier's deposition), which constitutes or contains trade secret data;
>
> 5. Mr. Stier's deposition testimony contained on the following pages and lines of the sealed portion of his deposition:
>
> \*     \*     \*     \*     \*     \*
>
> 6. Trade secret information regarding the design of the 204B or any other helicopter manufactured by Bell;
>
> 7. Any testimony that reveals trade secret data regarding the differences between the Bell Model 204B and the helicopter known as Serial No.2030;
>
> 8. All documents produced pursuant to the subpoena, which are described by the following category:
>
>> Any and all documents "in the custody or control of Bell Helicopter Textron, its agents, employees, attorneys, investigators, and/or anyone else acting on its behalf, which were reviewed by Fredrick [sic] L. Wilken in conjunction with his work for Lance J. Lerman and/or the Department of Justice in connection with this action, and which reference or reflect, but are not necessarily limited to, the design of any Bell model 204B or any UH–1 series helicopter."

The protective order sealed the record with respect to the information described in the protective order.

At the closing arguments on defendant's fraud counterclaim, the court explained that

---

**2.** At the time of the trial, Mr. Stier was a product service engineer for Bell. *Crane Helicopter Servs.,*

*Inc. v. United States,* 45 Fed.Cl. at 422.

the protective order was designed to seal a broad range of evidence during the trial, but that it would entertain a request to revisit the issue following the trial to determine what portion of the record, if any, should remain sealed. In that regard, the court directed the defendant to obtain Bell's input regarding which parts of the record, if any, should remain sealed. Subsequently, the government filed a report stating that it had consulted with Bell concerning the court's query. Included with defendant's status report was a submission from Bell arguing that a substantial portion of the record should remain sealed. Bell also submitted a five page list covering over one hundred different trial transcript excerpts, over forty deposition transcript excerpts and thirteen trial exhibits which it considered to contain proprietary information. Finally, Bell submitted an affidavit from M.D. McCrary, then Bell's Vice President for United States Government Contracts/Logistics. Mr. McCrary's affidavit is the only piece of evidence offered by any of the parties directly addressing the trade secrets issue. Mr. McCrary's affidavit states, in relevant part:

    *     *     *     *     *     *

2. Bell has been manufacturing rotorcraft for over 50 years. Throughout that history, Bell has never sold any of its trade secret rotorcraft technology or know-how. When Bell has licensed its technology and know-how, it has done so under strict contractual arrangements requiring, inter alia, that the licensee (i) use the Bell trade secret information solely for purposes and in the territory described in the agreement; (ii) not disclose the information to third parties without Bell's prior consent; (iii) cease using the Bell trade secret information for the manufacture of the licensed Bell product upon expiration or termination of the license agreement; and (iv) return of all technical and trade secret information, including copies and materials incorporating such information to Bell.

3. It is Bell's policy to require that any vendors suppling parts and materials to whom proprietary information is disclosed are subject to contractual obligations of confidentiality, prohibitions against disclosure, and restricted use of such proprie[t]ary information.

4. The following protective measures are the policies and procedures Bell employs to protect and maintain its proprietary information, including the proprietary information at issue in this litigation:

*Employees*

● Employees Confidentiality and Nondisclosure Agreement signed by all employees at the commencement of employment

● Specific guidelines regarding the creation, protection and safeguarding of proprietary and confidential information contained in the Bell Helicopter Textron Employee Handbook

● Bell Helicopter Standard Practice Instruction 110B entitled "intellectual Property Control" regarding the creation, protection and safeguarding of proprietary and confidential information

● Bell Helicopter Standard Practice Instruction 800A entitled "Proprietary Data Release" regarding the policy and guidelines for releasing of proprietary information and the protections and safeguards required

● Employees regularly instructed regarding the critical nature of and need to maintain the confidentiality of the proprietary and confidential information

● Employees subject to discipline, including discharge, for failing to observe guidelines regarding protection and nondisclosure of proprietary and confidential information

● Exit interviews with terminating employees to emphasize nondisclosure of Bell confidential and trade secret information

*Suppliers, Vendors and Representatives*

● Nondisclosure and confidentiality provisions contained in all agreements with representatives, agents, vendors and suppliers

● Visitors sign confidentiality agreements prior to visiting Bell facilities

*Plant Security*

● Identification badges required for all employees and visitors to prevent unauthorized personnel from entering the plant facilities and office buildings

• Coded badge readers and turnstiles at entrance to prevent unauthorized access

• Use of 24–hour, armed security guards at main gate, performing clocked rounds after business hours and Saturday, Sunday and holidays

• Visitor control log for all visitors to the facility and visitors must wait in reception area to be escorted into facility and office building

• Closed-circuit television monitors to observe activities in and around facility

• Entire facility surrounded by fencing to prevent unauthorized access Cameras and other recording devices by visitors and employees prohibited

• Controlled access through badge readers to certain technical areas, blueprint "crib", various development projects and certain manufacturing operations

• Internal security department with 68 full time employees to carry-out security policies

*Computer Software Security*

• Access to computer system requires password information before the computer responds

• Proprietary and confidential information generated or maintained on computers are stored in restricted directors requiring passwords and/or access codes limiting availability and disclosure only to authorized and necessary personnel

*Researching and Engineering*

• Bell Helicopter Engineering Department Administrative Instructions Number 806 entitled "Marking of BHTI Engineering Documents" containing the policy and detailed instructions for making drawings and documents containing proprietary and trade secret information, including a restricted disclosure notice and copyright notice

• Bell Helicopter Engineering Department Administrative Instructions Number 901 entitled "Engineering Drawing Approval and release Cycle" regarding procedure to control access to an alteration of proprietary information while it is being created and throughout approval cycle

• Bell Helicopter Engineering Department Administrative Instruction Number 807 entitled "Release of Bell Proprietary Data to Parties Outside of HTI" containing the policy and safeguards required to prevent unauthorized disclosure of proprietary information.

5. The helicopters that Bell designs and manufactures today represent the natural evolution of Bell design features of the early series of helicopters such as the Bell 204B and UH1. Bell capitalizes upon this prior experience and know-how in the design of its current fleet of aircraft. This proprietary information has been developed by Bell at enormous expense and is commercially valuable to Bell.

6. Unrestricted dissemination of such information could implicate issues of public safety due to the potential for others to misuse selected portions of Bell's proprietary information, and manufacture and/or sell inappropriate aircraft parts for use within the aviation industry, as if such parts or materials had been properly made pursuant to Bell's information.

7. Were such proprietary information, documents or testimony to be disclosed in an unrestricted fashion, such information, in the hands of any competitor, or would-be competitor, would work to Bell's severe business detriment, and could contravene existing contractual obligations.

\*      \*      \*      \*      \*      \*

On June 1, 1998, Crane submitted a response in which it argued that none of the items in the record constituted trade secrets, other than perhaps Exhibit 92, and that, "in the spirit of cooperation," plaintiff would concede that Exhibit 92 should remain under seal. On June 5, 1988, the government requested that the court "maintain the protective order in this case in a manner consistent with Bell's submission regarding protected material." Subsequently, Bell, Crane and the government supplemented their filings on the protective order issue.

On November 23, 1999, the court issued its opinion rejecting defendant's fraud counterclaim. *Crane Helicopter Servs., Inc. v. United States,* 45 Fed.Cl. 410. On June 14, 2000, the court dismissed plaintiff's claim pursuant

to a settlement agreement entered into between Crane and the government. Following a telephone conference with the parties, the court ordered the parties to update their positions on whether the record should remain sealed. After conferring with Bell, defendant filed a status report, significantly narrowing the scope of the record which it believed should remain under seal. According to the status report, the sharp reduction in material that defendant and Bell believed should remain sealed resulted from the fact that testimony concerning certain of Bell's alleged trade secrets had recently been elicited in open court in the case of *Crane Helicopter Services, Inc. v. United States Aviation Underwriters, et al.*, Case No 97–0698–WBS in the United States District Court for the Eastern District of California. Plaintiff subsequently filed a report which asserted, as plaintiff had various times during the proceedings, that the entire record should be unsealed.

The material which defendant and Bell now contend should be sealed includes exhibits 92 and 97 and roughly twenty pages of trial transcript. Exhibit 92 contains twenty-five separate design drawings of a Bell 204B helicopter. In its November 3, 2001 filing, although the plaintiff conceded that the drawings were "arguably a protectable trade secret," plaintiff argued that the design drawings contained in Exhibit 92, and/or other undesignated engineering drawings purporting to be of a Bell 204B, were admitted into evidence, without a protective order, in the case of *Crane Helicopter Services, Inc. v. United States Aviation Underwriters, et al.*, Case No 97–0698–WBS, and are contained in the public record of that case.

Exhibit 97 contains minutes from three of the Type Certificate Board Meetings held between the FAA and Bell when Bell was applying for a type certificate for the 204B helicopter. The first page of the exhibit is a letter from James L. Burt, chief attorney of product integrity for Bell, to Mr. Wilken identifying the source of the exhibits as "FAA files" and stating that the FAA had initially refused to permit Mr. Wilken to review the documents because of their proprietary nature. The letter also states that

Bell was releasing the documents only because Mr. Wilken had executed a protective agreement. The exhibit also includes minutes from the Interim Type Certificate Board Meeting held on June 25, 1962, the Preflight Certification Board Meeting held on February 5–6, 1963 and the Final Type Certificate Board Meeting held on March 29, 1963.

The Type Certificate Board Meetings arose out of Bell's attempt to acquire a type certificate for the 204B. Bell began with a UH–1 series helicopter to which it added certain features desirable to the civilian market. Additional features were added to the UH–1 series helicopter to meet the FAA's requirements. As a result, the minutes reveal the evolution of the Bell 204B from a UH–1 series helicopter and the differences between the UH–1 series helicopter and the prototypes for the 204B helicopter.

Exhibit 133, which neither Bell nor the defendant have maintained should be sealed, also contains minutes from Type Certificate Board Meetings. According to counsel for plaintiff, the documents in Exhibit 133 were given to him by an attorney named James Culliton, who has handled other 204B cases. The exhibit does not include a letter discussing their protective nature or indicating that they were pulled from FAA files. The majority of the minutes included in Exhibit 133 are not contained in Exhibit 97. Exhibit 133 does, however, include minutes from the Interim Type Certificate Board Meeting held on June 25, 1962, which also are included in Exhibit 97. Otherwise, Exhibits 97 and 133 do not overlap. Plaintiff argues that in addition to not being protectable under the Uniform Trade Secrets Act, Exhibit 97, in its entirety, is "[n]ot protectable, because substantially similar meetings (*Exhibit 133*) are already in the public domain" (emphasis in original).

The sections of the trial transcript defendant and Bell now argue should remain sealed are contained in the testimony of Tony Stier, a Product Service Engineer at Bell and Mr. Wilken, the defendant's expert. Bell and the defendant have classified the portions of the transcript into four categories. First, defendant and Bell request that the court seal the transcript from page 825, line

six to page 826, line three. This portion of Mr. Stier's testimony contains a general discussion of certain differences between a Bell UH–1 series helicopter and a Bell 204B helicopter, [REDACTED].

Defendant and Bell also request that the court seal Mr. Stier's testimony from page 862, line six to line ten, which discusses the difference in appearance [REDACTED] between the two helicopters.

The third portion of the transcript defendant and Bell wish the court to seal concerns Mr. Wilken's testimony from page 3054, line twenty-three to page 3055, line twenty-one. This portion of the testimony regards the [REDACTED] on a 204B helicopter relative to specific UH–1 series helicopters.

The final category of testimony which the defendant and Bell argue should remain sealed includes portions of Mr. Wilken's testimony describing the contents of Exhibit 97, the minutes from the type certificate board meetings on the Bell 204B which discuss the development and design of the Model 204B helicopter. Mr. Wilken reviewed the minutes from the type certificate board meetings to confirm the findings he made in his expert report. At the trial, he was questioned on redirect concerning which portions of the minutes of the type certificate board meetings he had considered. In response, Mr. Wilken described select portions of the minutes at page 3258, line one to page 3262, line one, page 3273, line eleven to page 3275, line four, page 3279, line one to page 3280, line twenty-five, page 3308, line one to line sixteen and page 6549, line nine to page 6554, line three.

## DISCUSSION

Under common law, the public has a general right to inspect and copy public records and documents, including evidence submitted in a judicial proceeding. *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978); *United States v. Graham,* 257 F.3d 143, 149 (2d Cir.2001); *Miller–Holzwarth, Inc. v. United States,* 44 Fed.Cl. 153, 154 (1999). The right of access, however, does not attach to every piece of information involved in litigation. "Generally, the information [involved in liti-

gation] will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance." *United States v. Amodeo,* 71 F.3d 1044, 1049 (2d Cir.), *rev'g,* 1995 WL 261517 (S.D.N.Y.), *on remand from,* 44 F.3d 141 (2d Cir.1995); *see also Chi. Tribune Co. v. Bridgestone/Firestone, Inc.,* 263 F.3d 1304, 1311 (11th Cir.2001). Thus, courts have routinely found that the right of public access does not attach to discovery materials not submitted to the court because such pretrial discovery may be unrelated or only tangentially related to the issues in the case and ultimately not filed with the court. *See Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 33, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984); *Union Oil Co. of Cal. v. Leavell,* 220 F.3d 562, 568 (7th Cir.2000). Similarly, courts are reluctant to seal information submitted with a motion to compel discovery or with a motion for summary judgment that is denied. *Chi. Tribune Co. v. Bridgestone/Firestone, Inc.,* 263 F.3d at 1315 (finding that right of public access did not attach to documents submitted with motion to compel discovery); *United States v. Graham,* 257 F.3d at 151 (noting that documents submitted with motion for summary judgment which was denied may not be covered by the right of public access). Courts, however, have found that the right of public access attaches when information is submitted with a motion for summary judgment upon which the court basis a decision on the merits, or when information is submitted at trial. *United States v. Graham,* 257 F.3d at 150–51; *Wash. Legal Found. v. United States Sentencing Comm'n,* 89 F.3d 897, 906 (D.C.Cir.1996) (citing *FTC v. Standard Fin. Mgmt. Corp.,* 830 F.2d 404, 409 (1st Cir. 1987)); *Rushford v. New Yorker Magazine, Inc.,* 846 F.2d 249, 252 (4th Cir.1988).

Additionally the public right of access may attach even though the testimony was elicited during a closed portion of the trial and the exhibits were admitted under seal. As the United States Court of Appeals for the Third Circuit noted in *In re Cendant Corp.*:

> The strong presumption of public access forces district courts to be cognizant of when the reasons supporting sealing in a

specific case (if any are found) have either passed or weakened, and to be prepared at that time to unseal [information] and allow public access. Even if a sealing order was proper at the time when it was initially imposed, the sealing order must be lifted at the earliest possible moment when the reasons for sealing no longer obtain.

260 F.3d 183, 196 (3d Cir.2001).

Even when the right of public access attaches, however, that right is not absolute, and a court may, in its discretion, deny access to its own records and files to the extent necessary to prevent those files from becoming "a vehicle for improper purposes." *Nixon v. Warner Communications, Inc.*, 435 U.S. at 598, 98 S.Ct. 1306; *see also United States v. Three Juveniles*, 61 F.3d 86, 94 (1st Cir.1995), *cert. denied sub nom., Globe Newspaper Co. v. United States*, 517 U.S. 1166, 116 S.Ct. 1564, 134 L.Ed.2d 664 (1996); *Black v. United States*, 24 Cl.Ct. 461, 464 (1991). The decision as to whether the public right of access outweighs the need to protect against the improper use of submitted evidence must be made "in light of the relevant facts and circumstances of the particular case." *Nixon v. Warner Communications, Inc.*, 435 U.S. at 599, 98 S.Ct. 1306; *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818 (2d Cir.1997), *cert. denied*, 522 U.S. 1049, 118 S.Ct. 695, 139 L.Ed.2d 639, *reh'g denied*, 522 U.S. 1154, 118 S.Ct. 1180, 140 L.Ed.2d 187 (1998); *United States v. McDougal*, 103 F.3d 651, 658 (8th Cir.1996), *cert. denied*, 522 U.S. 809, 118 S.Ct. 49, 139 L.Ed.2d 15 (1997). In this regard, courts have found that the denial of access to judicial records may be necessary to protect trade secrets. *See Nixon v. Warner Communications, Inc.*, 435 U.S. at 589, 98 S.Ct. 1306 ("[C]ourts have refused to permit their files to serve ... as sources of business information that might harm a litigant's competitive standing."); *United States v. Amodeo*, 44 F.3d at 147; *Leucadia, Inc. v. Applied Extrusion Techs., Inc.*, 998 F.2d 157, 166 (3d Cir.1993); *Pratt & Whitney Can. Inc. v. United States*, 14 Cl.Ct. 268, 275 (1988). As the sole basis for claiming that the exhibits and testimony at issue should be protected, defendant and Bell argue that the material contains trade secrets. Therefore,

the court must review whether or not the information contains trade secret information. If the information does not contain trade secrets, the record should be unsealed. *See Chi. Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d at 1317.

"[T]he common law of trade secrets is a product of the state courts, not the federal courts ...." Melvin F. Jager, 1 *Trade Secrets Law* § 2.03 at 2–22 (2001). Consequently, federal courts confronting trade secret issues look to state law. *See Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1116 (Fed.Cir.1996); *Rohm and Haas Co. v. Adco Chem. Co.*, 689 F.2d 424, 428–29 (3d Cir.1982) (rejecting argument that the Supreme Court established federal common law of trade secrets in *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1976)). The court, thus, looks to the Uniform Trade Secrets Act (UTSA), which specifically was adopted by the parties and the court in the protective order and which has been adopted, with modifications, by forty-four states. *See* Jager, 1 *Trade Secrets Law* § 3.05[1] at 3–70 (listing states that have adopted UTSA with accompanying citations to relevant sections of state codes).

The UTSA, defines a trade secret as:

[I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that: (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

UTSA § 1(4) (1985).

Pursuant to the UTSA, the first step is to determine whether the owner of the information derives economic value from the information not being readily known or readily ascertainable. The only direct evidence before the court regarding the economic value of the information in question is Mr. McCrary's unrefuted affidavit. The affidavit states that the design information concerning the 204B is used by Bell in its current air-

craft designs, that this information has been developed by Bell at considerable expense and that the information has commercial value to Bell. In addition, Mr. McCrary's affidavit states that the design information at issue could be used by others to manufacture and/or sell aircraft parts as if such parts had been properly made pursuant to Bell's information. Consequently, the dissemination of such information would damage Bell's competitive standing. At trial, the parties disputed the extent to which persons or groups converted surplus Bell UH–1 series aircraft to look like a Bell 204B helicopter. *Crane Helicopter Servs., Inc. v. United States,* 45 Fed.Cl. 410. With regard to the general assertion made by Mr. McCrary in his affidavit concerning the unauthorized manufacture of parts, however, experts from both parties agreed that such practice is a widespread problem in the aircraft industry. Additionally, a review by the FAA Suspected "Unapproved Parts" Task Force found that there "are numerous sources of parts that do not meet applicable requirements but that do enter the aviation system." FAA, *Suspected "Unapproved Parts" Program Plan* 1–3 (1995). Thus, the risk of a competitor using Bell's information at issue to manufacture unauthorized parts appears to be a reasonable concern which, if such conversion occurred, would result in damage to Bell's competitive standing and reputation.

The court also must consider Bell's efforts at maintaining secrecy as evidence that the secret has economic value. *See Rockwell Graphic Sys. Inc. v. DEV Indus., Inc.,* 925 F.2d 174, 178–79 (7th Cir.1991). As discussed more fully below, Mr. McCrary's affidavit lists a significant number of actions taken by Bell to ensure the secrecy of the information in question. In addition, Bell's active presence in this lawsuit, in which, even according to plaintiff, it was represented by no less than four attorneys from two different law firms, is probative. Bell acted to ensure that all parties to the litigation entered into a protective agreement prior to receiving any of the evidence at issue, acted to ensure that the court entered a protective order prior to receiving into evidence any of the information in question and was present during arguments regarding protection of

the information and during the testimony of its employees. Bell's active attempts to protect the information at issue evidences a belief in the information's value, which the court must consider.

With regard to a portion of Exhibit 97, however, Bell's actions in this litigation indicate that it does not consider a part of the exhibit to be of economic value. Exhibit 97 contains minutes from three Type Certification Board Meetings: the Interim Type Certificate Board Meeting held on June 25, 1962, starting on page three of the exhibit, and running through page fourteen, the Preflight Certification Board Meeting held on February 5–6, 1963, starting on page fifteen of the exhibit and running through page twenty-nine, and the Final Type Certificate Board Meeting held on March 29, 1963, starting on page thirty of the exhibit and continuing until the end of the exhibit. The minutes from the Interim Type Certificate Board Meeting held on June 25, 1962 also are contained, verbatim, in Exhibit 133 from page twenty-eight through page thirty-nine. Neither Bell nor the defendant has requested that the court seal Exhibit 133. This action on the part of Bell and the defendant is indicative of a belief that the information contained therein is not a trade secret.

Based on the above discussion, the court finds that the information identified by Bell and the defendant, with the exception of the June 25, 1962 Type Certificate Board Meeting minutes, is of economic value to Bell. Having found that Bell derives economic value from the information at issue, the court turns to whether that information is readily ascertainable.

■ An early basic tenet of trade secrets law was that the material "must be secret, and must not be of public knowledge or of a general knowledge in the trade or business." *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. at 475, 94 S.Ct. 1879. Modern courts, however, have taken a different approach: " 'Secrecy' may be measured by 'the ease with which information can be developed through proper means: if the information can be readily duplicated without involving considerable time, effort or expense, then it is not se-

cret.'" *C & F Packing Co., Inc. v. IBP, Inc.,* 224 F.3d 1296, 1302 (Fed.Cir.2000) (finding trade secret based, in part, on fact that competitors would have found it difficult to replicate process for making Italian sausage pizza and quoting *Hamer Holding Group, Inc. v. Elmore,* 202 Ill.App.3d 994, 148 Ill.Dec. 310, 560 N.E.2d 907, 918 (1990), *appeal denied,* 136 Ill.2d 544, 153 Ill.Dec. 373, 567 N.E.2d 331 (1991) (table)). The UTSA does not require absolute secrecy, instead requiring only that the material not be readily ascertainable by people who could obtain economic value from the information. UTSA § 1(4)(i). According to the Comments to section 1(4)(i) of the UTSA, "[i]nformation is readily ascertainable if it is available in trade journals, reference books, or published materials. Often, the nature of a product lends itself to being readily copied as soon as it is available on the market." UTSA § 1(4) cmt. Both the comment to the UTSA and the courts agree that information may be classified as a trade secret, regardless of its presence in the public domain or the ability of a competitor to acquire the information, based on the difficulty in discovering the trade secret, for example, through reverse-engineering. *See* UTSA § 1(4) cmt.; *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.,* 174 F.3d 411, 419 (4th Cir.1999). Moreover, "[e]ven if all of the information is publicly available, a unique compilation of that information, which adds value to the information, also may qualify as a trade secret." *Capital Asset Research Corp. v. Finnegan,* 160 F.3d 683, 686 (11th Cir.1998).

Crane has conceded that Exhibit 92, which contains twenty-five separate design drawings of a Bell 204B helicopter, "arguably" contains trade secrets. Crane contends, however, that the design drawings and/or other, undesignated drawings purporting to be of a Bell 204B, were admitted into evidence, without a protective order, in the case of *Crane Helicopter Services, Inc. v. United States Aviation Underwriters, et al.,* Case No 97–0698–WBS and, thus, have lost their status as trade secrets. Plaintiff has not offered any evidence as to the truth of this statement. Nor has defendant conceded this fact. Therefore, without more, the court cannot conclude that Exhibit 92 has lost its

trade secret status. Furthermore, even if Exhibit 92 had been filed in a court proceeding, that fact, while probative, would not be dispositive. *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.,* 174 F.3d at 418–19 (filing of a document in court does not, necessarily, relieve it of its status as trade secret); *Gates Rubber Co. v. Bando Chem. Indus., Ltd.,* 9 F.3d 823, 848–49 (10th Cir.1993). The court would have to take into account other evidence such as the duration of time the documents had been on the public record, the stage of the proceeding the documents were introduced and whether the information had been introduced to the general public to determine whether the design drawings had lost their trade secret status. *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.,* 174 F.3d at 418–19 (discussing *Religious Tech. Ctr. v. Lerma,* 908 F.Supp. 1362 (E.D.Va. 1995)).

The remaining portions of the record which Bell and the defendant seek to have remain sealed contain information discussing the differences between the Bell UH–1 series helicopters and the Bell 204B helicopter. Crane puts forth two arguments regarding this information. First, Crane argues that by placing the helicopters in the public stream, Bell has made the information regarding the differences between the aircraft readily ascertainable. Second, Crane argues that a simple reference to a part of a helicopter as different from the same part on another helicopter does not rise to the level of a trade secret. The mere presence of a product in public commerce does, however, not make a trade secret contained in that product readily ascertainable. As the following discussion will show, the differences between a Bell UH–1 series helicopter and a Bell 204–B helicopter are not readily ascertainable because the development of such information is highly costly, time consuming and difficult. *See C & F Packing Co., Inc. v. IBP, Inc.,* 224 F.3d at 1302.

For example, the first step in acquiring the information at issue might be to acquire a Bell 204B helicopter and a Bell UH–1 series helicopter and place them side-by-side. Although the plaintiff argues that the differences between the two aircraft have lost

their trade secret status because both helicopters are present in public commerce, a person could not discern the differences between the two simply by placing them side by side. A person attempting to discern the differences would have to inspect every part on each aircraft. The person performing the inspection could not focus on specific parts because that person would not automatically understand which parts to focus on to identify the differences. The inspection would not only require a thorough observation of the aircraft, but also would necessitate that the person take apart both aircraft. Even Mr. Stier testified during the trial that he could not confirm some of the differences between the [REDACTED] of the two aircraft because he did not want to remove the [REDACTED]. *Crane Helicopter Servs., Inc. v. United States,* 45 Fed.Cl. at 443. Many of the differences involved are small and are not readily apparent from a casual inspection. For example, an Inter–Office Memo from Bell attached to Exhibit 97 mentions that [REDACTED]. Consequently, many of the differences between the two aircraft could be detectable only during a painstakingly detailed inspection. The court, therefore, finds that discovering the differences between the two aircraft would be time consuming, difficult and costly and, thus, not readily ascertainable.

Crane also has argued that the descriptions, contained in the record, of the differences between the UH–1 series helicopters and the 204B helicopter are too general to be classified as trade secrets. Even if plaintiff is correct, however, a general discussion of a difference between the two helicopters would reveal the fact of the differences, thus making the process of identifying the differences between the two aircraft less time and cost consuming. Likewise, at least one of the documents contained in the record, the minutes of the Final Type Certificate Board Meeting contained in Exhibit 97, also includes a list of the differences and similarities between the 204B and the UH–1, and could be used to determine which parts of the two aircraft are similar. For example, the document states that [REDACTED]. It is important to note that the "definition [of trade secrets under the UTSA] includes information that has commercial value from a negative viewpoint, for example the results of lengthy and expensive research which proves that a certain process will *not* work could be of great value to a competitor." UTSA § 1(4) cmt. (emphasis in original); *see also Religious Tech. Ctr. v. Wollersheim,* 796 F.2d 1076, 1090 (9th Cir.1986), *cert. denied,* 479 U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 187 (1987); *Metallurgical Indus. Inc. v. Fourtek, Inc.,* 790 F.2d 1195, 1203 (5th Cir.1986) (discussing changes necessary for turning unusable furnaces into furnaces fit for commercial use). The fact that there are certain, nonobvious similarities between the aircraft in question also can constitute a trade secret. Thus, the information contained in Exhibit 97 identifying which parts are not different between the Bell 204B and the Bell UH–1 series helicopters also may be considered trade secrets. Based on the above discussion, the court finds that the information in question is not readily ascertainable to a person who could receive economic benefit from the information.

The final step is to determine whether Bell has taken reasonable means to protect the secrecy of the information at issue. The list of precautions taken by Bell to protect its trade secret information, as described in Mr. McCrary's unrefuted affidavit, is sufficient to meet this requirement. For example, according to Mr. McCrary:

> Bell has been manufacturing rotorcraft for over 50 years. Throughout that history, Bell has never sold any of its trade secret rotorcraft technology or know-how. When Bell has licensed its technology and know-how, it has done so under strict contractual arrangements requiring, inter alia, that the licensee (i) use the Bell trade secret information solely for purposes and in the territory described in the agreement; (ii) not disclose the information to third parties without Bell's prior consent; (iii) cease using the Bell trade secret information for the manufacture of the licensed Bell product upon expiration or termination of the license agreement; and (iv) return of all technical and trade secret information, including copies and materials incorporating such information, to Bell.

Also according to the Mr. McCrary, Bell tightly controls its employees' access to proprietary information by requiring employees to sign confidentiality and nondisclosure agreements at the beginning of their employment. Bell publishes guidelines for the creation, protection and release of its proprietary and confidential information in the Bell Helicopter Textron Employee Handbook. In addition, employees are regularly instructed regarding the critical nature of and need to maintain the confidentiality of Bell's proprietary and confidential information. Employees are subject to discipline, including discharge, for failing to observe Bell's guidelines for protecting its proprietary and confidential information. Bell also includes nondisclosure and confidentiality provisions in its agreements with representatives, agents, vendors and suppliers. Furthermore, Bell actively protects its computer systems. Access to computer systems requires a password before the computer responds. Moreover, proprietary and confidential information generated or maintained on computers is stored in restricted directories that may be accessed only by passwords or access codes. Bell also strictly controls access to its plants and offices. Visitors must sign confidentiality agreements before visiting Bell plant facilities. Identification badges are required for all employees and visitors to prevent unauthorized persons from entering the plant facilities or offices. Furthermore, Bell has installed coded badge readers and turnstiles at entrances to prevent unauthorized access. Coded badge readers also are used in certain technical areas. Bell's entire plant facility is surrounded by fencing and cameras. The facility also is patrolled, twenty-four hours a day, by an internal security department with sixty-eight full time employees. Plaintiff has not offered any information to dispute Mr. McCrary's statement or attempted to argue that Bell does not undertake reasonable means to protect its information. Consequently, the court finds that Bell has put into place reasonable means to maintain the secrecy of the information it seeks to protect.

The preceding discussion, therefore, demonstrates that the material identified by Bell and the defendant, except for the minutes from the Interim Type Certificate Board Meeting held on June 25, 1962 contained in Exhibit 97 and Exhibit 133, constitute trade secrets. Bell derives economic value from the fact that the information is not readily ascertainable and has taken reasonable precautions to protect against its disclosure.

Because the court has found that the record in the instant case contains trade secrets, the final step is to balance the public's right of access to those records against the risk of harm to Bell from improper use. While the courts have described clear rules for determining whether the right of public access attaches to certain information, the United States Circuit Courts of Appeals have differed on the standards for determining whether the danger of improper use of a particular piece of evidence outweighs the public right of access. *See Chi. Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d at 1311; *United States v. Graham*, 257 F.3d at 149 n. 2; *United States v. Amodeo*, 71 F.3d at 1048. For example, the United States Courts of Appeals for the First, Second, Third, Seventh, Ninth, Eleventh and District of Columbia Circuits describe the right of public access as a "strong presumption" which may only be overcome in light of a compelling, or important interest. *In re Providence Journal, Co.*, 293 F.3d 1, 10 (1st Cir.2002); *United States v. Graham*, 257 F.3d at 149; *San Jose Mercury News, Inc. v. United States Dist. Court–Northern Dist.*, 187 F.3d 1096, 1102 (9th Cir.1999); *United States v. Guzzino*, 766 F.2d 302, 304 (7th Cir.1985); *United States v. Rosenthal*, 763 F.2d 1291, 1294 (11th Cir.1985); *In re Nat'l Broad. Co.*, 653 F.2d 609, 613 (D.C.Cir.1981); *United States v. Criden*, 648 F.2d 814, 823 (3d Cir.1981). The United States Courts of Appeals for the Fifth, Sixth and Eighth Circuits have rejected the "strong presumption" of public access in favor of a standard that more evenly balances the danger of improper use against the right of public access. *United States v. McDougal*, 103 F.3d 651, 657 (8th Cir.1996); *United States v. Beckham*, 789 F.2d 401, 414 (6th Cir.1986); *Wilson v. Amer. Motors Corp.*, 759 F.2d 1568, 1571 (11th Cir.1985); *Belo Broad. Corp. v. Clark*, 654 F.2d 423, 433–34 (5th Cir.1981).

Although the United States Court of Appeals for the Federal Circuit has not had the opportunity to formally address the issue, cases from the United States Court of Federal Claims, and its predecessor, the United States Claims Court, have relied on a standard which gives heightened status to the right of public access. In *Pratt & Whitney Canada Inc. v. United States,* the United States Claims Court noted that "[a] trial court 'must set forth substantial reasons for denying' access to its records." 14 Cl.Ct. at 275 (quoting *United States v. Beckham,* 789 F.2d at 413). The *Pratt & Whitney* court also cited *FTC v. Standard Financial,* 830 F.2d at 410 for the statement that "[o]nly the most compelling reasons justify denying access to information which was not publicly available during a hearing or available in another form." *Pratt & Whitney Can. Inc. v. United States,* 14 Cl.Ct. at 275. Furthermore, the standards set forth in *Pratt & Whitney Canada Inc.* were adopted by the court in *Black v. United States,* 24 Cl.Ct. at 464 and *Miller–Holzwarth, Inc. v. United States,* 44 Fed.Cl. at 154.

The Supreme Court has stated that: "There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it." *Craig v. Harney,* 331 U.S. 367, 374, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947). Consistent with this direction, this court agrees that a court should set forth compelling reasons to rebut the strong presumption of the public right to access of judicial records. In the case currently before this court, Bell, throughout these proceedings, has presented compelling reasons for the court to seal limited portions of the record. With the exception of the minutes of the Type Certificate Board Meeting on June 25, 1962, which, curiously, Bell has not requested be sealed as they appear in Exhibit 133, the court is persuaded that release of the limited documents, requested by Bell to be sealed, could significantly damage Bell's competitive advantage. In addition, release of the information could allow the production of unauthorized replacement parts, which would not only damage Bell's commercial prospects, but would also allow persons or groups to subvert FAA regulations and potentially pose a danger to the public. Thus, the court finds that there is a compelling reason to prevent the public from accessing the material identified by Bell and the defendant. Because Bell and the defendant have not requested that Exhibit 133 continue to be protected, the court concludes that the identical minutes of the Type Certificate Board Meeting dated June 25, 1962 in Exhibit 97 also no longer need protection.

## CONCLUSION

Pursuant to the above discussion, the court, hereby, **DIRECTS** the clerk's office to **UNSEAL** all of the records in the above captioned case **EXCEPT:**

1. Exhibit 92;

2. Exhibit 97, pages 15–80;

3. Trial transcript page 825 line six to page 826 line three;

4. Trial transcript page 862 line six to line ten;

5. Trial transcript page 3054 line twenty-three to page 3055 line twenty-one;

6. Trial transcript page 3258 line one to page 3262 line one, page 3273 line eleven to page 3275 line four, page 3279 line one to page 3280 line twenty-five, page 3308 line one to line sixteen and page 6549 line nine to page 6554 line three.

These limited portions of the record shall remain under seal. The defendant is instructed to deliver a copy of this order to Bell. This order will remain under seal for two weeks from the date this order is filed, following which, a redacted version will be released to the public.

**IT IS SO ORDERED.**